Policy Number**:**  **US00080794DO17A**               **Indian Harbor Insurance Company**
Renewal of Number:   N/A                                                  **Members of the XL America Companies**

---

| **EXECUTIVE AND CORPORATE SECURITIES** |
| **LIABILITY INSURANCE POLICY DECLARATIONS** |

**Regulatory Office**                                                                  **Executive Offices**
505 Eagleview Blvd. Suite 100                                                    70 Seaview Avenue
Dept: Regulatory                                                          Stamford, CT 06902-6040
Exton, PA 19341-1120                                                   Telephone 877-953-2636
Telephone 800-688-1840

**THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR, IF APPLICABLE, THE OPTIONAL EXTENSION PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**THE INSURER(S) NAMED HEREIN IS (ARE) NOT LICENSED BY THE STATE OF NEW YORK, NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF THE INSURER(S), NOT PROTECTED BY THE NEW YORK STATE SECURITY FUNDS.  THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE INSURANCE DEPARTMENT PERTAINING TO POLICY FORMS.**

---

**Item 1. Name and Mailing Address of Parent Company**:
    Amtrust Financial Services, Inc.
    59 Maiden Lane, 43rd Floor
    New York, NY 10038

---

**Item 2. Policy Period**:  Inception Date: October 21, 2017        Expiration Date: October 21, 2018
        **At 12:01AM Standard Time at your Mailing Address Shown Above**

---

**Item 3. Limit of Liability**:

(A) $250,000        Maximum Aggregate Sublimit of Liability each **Policy Period** for all **Investigation Demands**

(B) $5,000,000        Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Loss** from all **Claims**, **Investigation Demands** and **Interviews**

---

**Item 4. Retentions**:

| | |
|---|---|
| $0.00 | each **Insured Person** under INSURING AGREEMENT I (A) or (D) |
| $5,000,000 | each **Claim**, other than a **Securities Claim**, under INSURING AGREEMENT I (B) or (E) |
| $5,000,000 | each **Securities Claim** under INSURING AGREEMENT I (B) or (C) |
| $0.00 | each **Investigation Demand** under INSURING AGREEMENT I (F) |

---

**Item 5. Optional Extension Period**:
    Length of Optional Extension Period:   One Year after the end of the **Policy Period**, if elected.
    Premium for Optional Extension Period:     $1,000,000.00

---

**Item 6. Pending and Prior Litigation Date**:       October 21, 2017

---

**Item 7. Notices required to be given to the Insurer must be addressed to**:
    XL Professional Insurance
    100 Constitution Plaza, 17th Floor
    Hartford, CT 06103
    Toll Free Telephone: 877-953-2636 or proclaimnewnotices@xlcatlin.com

---

**Item 8. Premium**:
    Taxes, Surcharges or Fees        $0.00
    Total Policy Premium              $500,000.00

---

BR 70 01 0914                                                                                       Page 1 of 2
*© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.*

EXHIBIT 2

**EXECUTIVE AND CORPORATE SECURITIES LIABILITY INSURANCE POLICY DECLARATIONS**

---

**Item 9. Policy Form and Endorsements Attached at Issuance**:
BR 71 00 09 14   XL 80 24 03 03   IHIC-NYSOP (02/07)   BR 83 63 11 16   XL 83 13 05 00   BR 83 11 03 15
BR 83 106 07 17   XL 80 72 06 13   XL 80 74 07 13   XL 80 75 07 14

---

THESE **DECLARATIONS** AND THE POLICY, WITH THE ENDORSEMENTS, ATTACHMENTS, AND THE **APPLICATION** SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE **INSURED** RELATING TO THIS INSURANCE.

EXHIBIT 2

# IN WITNESS

## INDIAN HARBOR INSURANCE COMPANY

REGULATORY OFFICE
505 EAGLEVIEW BOULEVARD, SUITE 100
DEPARTMENT:  REGULATORY
EXTON, PA  19341-1120
PHONE:  800-688-1840


It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.


All other provisions remain unchanged.


IN WITNESS WHEREOF, the Insurer has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Insurer.


| | |
|---|---|
| Joseph Tocco | Toni Ann Perkins |
| President | Secretary |

©2014 X.L. America, Inc.  All rights reserved.  May not copied without permission.

EXHIBIT 2

## NOTICE TO POLICYHOLDERS

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTRO ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy.  You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to the impact of U.S. Trade Sanctions[1].  Please read this Policyholder Notice carefully.

In accordance with the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") regulations, or any other U.S. Trade Sanctions applied by any regulatory body, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law, is a Specially Designated National and Blocked Person ("SDN"), or is owned or controlled by an SDN, this insurance will be considered a blocked or frozen contract. When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC.  Other limitations on the premiums and payments also apply.

[1] "U.S Trade Sanctions" may be promulgated by Executive Order, act of Congress, regulations from the U.S. Departments of State, Treasury, or Commerce, regulations from the State Insurance Departments, etc.

PN CW 05 1017

©2017 X.L. America, Inc.  All rights reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

EXHIBIT 2

# POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM
## INSURANCE COVERAGE

**Coverage for acts of terrorism is already included in your current policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed.  As defined in Section 102(1) of the Act:  The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.   Under your existing coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by federal law.   Under this formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019; and 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. However, your policy may contain other exclusions that may affect your coverage.  The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.**

**The portion of your annual premium that is attributable to coverage for acts of terrorism is: $ waived.  Any premium waiver is only valid for the current Policy Period.**

I ACKNOWLEDGE THAT I HAVE BEEN NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT, AS AMENDED, ANY LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM UNDER MY POLICY COVERAGE MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT AND I HAVE BEEN NOTIFIED OF THE AMOUNT OF MY PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

Name of Insurer:   **Indian Harbor Insurance Company**

Policy Number:   **US00080794DO17A**

_____
Signature of Insured

_____
Print Name and Title

_____
Date

EXHIBIT 2

## NOTICE TO POLICYHOLDERS

**PRIVACY POLICY**

The XL Catlin insurance group (the "Companies"), believes personal information that we collect about our customers, potential customers, and proposed insureds (referred to collectively in this Privacy Policy as "customers") must be treated with the highest degree of confidentiality.  For this reason and in compliance with the Title V of the Gramm-Leach-Bliley Act ("GLBA"), we have developed a Privacy Policy that applies to all of our companies.  For purposes of our Privacy Policy, the term "personal information" includes all information we obtain about a customer and maintain in a personally identifiable way.  In order to assure the confidentiality of the personal information we collect and in order to comply with applicable laws, all individuals with access to personal information about our customers are required to follow this policy.

### Our Privacy Promise

Your privacy and the confidentiality of your business records are important to us.  Information and the analysis of information is essential to the business of insurance and critical to our ability to provide to you excellent, cost-effective service and products.  We understand that gaining and keeping your trust depends upon the security and integrity of our records concerning you.  Accordingly, we promise that:

1. We will follow strict standards of security and confidentiality to protect any information you share with us or information that we receive about you;
2. We will verify and exchange information regarding your credit and financial status only for the purposes of underwriting, policy administration, or risk management and only with reputable references and clearinghouse services;
3. We will not collect and use information about you and your business other than the minimum amount of information necessary to advise you about and deliver to you excellent service and products and to administer our business;
4. We will train our employees to handle information about you or your business in a secure and confidential manner and only permit employees authorized to use such information to have access to such information;
5. We will not disclose information about you or your business to any organization outside the XL Catlin insurance group of Companies or to third party service providers unless we disclose to you our intent to do so or we are required to do so by law;
6. We will not disclose medical information about you, your employees, or any claimants under any policy of insurance, unless you provide us with written authorization to do so, or unless the disclosure is for any specific business exception provided in the law;
7. We will attempt, with your help, to keep our records regarding you and your business complete and accurate, and will advise you how and where to access your account information (unless prohibited by law), and will advise you how to correct errors or make changes to that information; and
8. We will audit and assess our operations, personnel and third party service providers to assure that your privacy is respected.

### Collection and Sources of Information

We collect from a customer or potential customer only the personal information that is necessary for (a) determining eligibility for the product or service sought by the customer, (b) administering the product or service obtained, and (c) advising the customer about our products and services.  The information we collect generally comes from the following sources:

- Submission – During the submission process, you provide us with information about you and your business, such as your name, address, phone number, e-mail address, and other types of personal identification information;
- Quotes – We collect information to enable us to determine your eligibility for the particular insurance product and to determine the cost of such insurance to you.  The information we collect will vary with the type of insurance you seek;
- Transactions – We will maintain records of all transactions with us, our affiliates, and our third party service providers, including your insurance coverage selections, premiums, billing and payment information, claims history, and other information related to your account;

PN CW 02 1015

© 2015 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

EXHIBIT 2

## NOTICE TO POLICYHOLDERS

- Claims – If you obtain insurance from us, we will maintain records related to any claims that may be made under your policies.  The investigation of a claim necessarily involves collection of a broad range of information about many issues, some of which does not directly involve you.  We will share with you any facts that we collect about your claim unless we are prohibited by law from doing so.  The process of claim investigation, evaluation, and settlement also involves, however, the collection of advice, opinions, and comments from many people, including attorneys and experts, to aid the claim specialist in determining how best to handle your claim.  In order to protect the legal and transactional confidentiality and privileges associated with such opinions, comments and advice, we will not disclose this information to you; and
- Credit and Financial Reports – We may receive information about you and your business regarding your credit.  We use this information to verify information you provide during the submission and quote processes and to help underwrite and provide to you the most accurate and cost-effective insurance quote we can provide.

Retention and Correction of Personal Information

We retain personal information only as long as required by our business practices and applicable law.  If we become aware that an item of personal information may be materially inaccurate, we will make reasonable effort to re-verify its accuracy and correct any error as appropriate.

Storage of Personal Information

We have in place safeguards to protect data and paper files containing personal information.

Sharing/Disclosing of Personal Information

We maintain procedures to assure that we do not share personal information with an unaffiliated third party for marketing purposes unless such sharing is permitted by law.  Personal information may be disclosed to an unaffiliated third party for necessary servicing of the product or service or for other normal business transactions as permitted by law.

We do not disclose personal information to an unaffiliated third party for servicing purposes or joint marketing purposes unless a contract containing a confidentiality/non-disclosure provision has been signed by us and the third party.  Unless a consumer consents, we do not disclose "consumer credit report" type information obtained from an application or a credit report regarding a customer who applies for a financial product to any unaffiliated third party for the purpose of serving as a factor in establishing a consumer's eligibility for credit, insurance or employment.  "Consumer credit report type information" means such things as net worth, credit worthiness, lifestyle information (piloting, skydiving, etc.) solvency, etc.  We also do not disclose to any unaffiliated third party a policy or account number for use in marketing.  We may share with our affiliated companies information that relates to our experience and transactions with the customer.

Policy for Personal Information Relating to Nonpublic Personal Health Information

We do not disclose nonpublic personal health information about a customer unless an authorization is obtained from the customer whose nonpublic personal information is sought to be disclosed.  However, an authorization shall not be prohibited, restricted or required for the disclosure of certain insurance functions, including, but not limited to, claims administration, claims adjustment and management, detection, investigation or reporting of actual or potential fraud, misrepresentation or criminal activity, underwriting, policy placement or issuance, loss control and/or auditing.

Access to Your Information

Our employees, employees of our affiliated companies, and third party service providers will have access to information we collect about you and your business as is necessary to effect transactions with you.  We may also disclose information about you to the following categories of person or entities:

PN CW 02 1015

© 2015 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

EXHIBIT 2

# NOTICE TO POLICYHOLDERS

- Your independent insurance agent or broker;
- An independent claim adjuster or investigator, or an attorney or expert involved in the claim;
- Persons or organizations that conduct scientific studies, including actuaries and accountants;
- An insurance support organization;
- Another insurer if to prevent fraud or to properly underwrite a risk;
- A state insurance department or other governmental agency, if required by federal, state or local laws; or
- Any persons entitled to receive information as ordered by a summons, court order, search warrant, or subpoena.

<u>Violation of the Privacy Policy</u>

Any person violating the Privacy Policy will be subject to discipline, up to and including termination.

For more information or to address questions regarding this privacy statement, please contact your broker.

PN CW 02 1015

© 2015 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

EXHIBIT 2

## NOTICE TO POLICYHOLDERS

**FRAUD NOTICE**

| | |
|---|---|
| **Arkansas** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Colorado** | **It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.** |
| **District of Columbia** | **WARNING:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| **Florida** | Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| **Kansas** | A "fraudulent insurance act" means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto. |
| **Kentucky** | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| **Louisiana** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Maine** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| **Maryland** | Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **New Jersey** | Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties. |
| **New Mexico** | ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES. |

© 2017 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

EXHIBIT 2

## NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **New York** | **General: All applications for commercial insurance, other than automobile insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.<br><br>**All applications for automobile insurance and all claim forms:** Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.<br><br>**Fire:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.<br><br>The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
| **Ohio** | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |
| **Oklahoma** | **WARNING:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony. |
| **Pennsylvania** | **All Commercial Insurance, Except As Provided for Automobile Insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.<br><br>**Automobile Insurance:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |
| **Puerto Rico** | **Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.** |

© 2017 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

EXHIBIT 2

## NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **Rhode Island** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Tennessee** | **All Commercial Insurance, Except As Provided for Workers' Compensation** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.<br><br>**Workers' Compensation:**  It is a crime to knowingly provide false, incomplete or misleading information to any party to a workers' compensation transaction for the purpose of committing fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Utah** | **Workers' Compensation:**  Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison. |
| **Virginia** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Washington** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **West Virginia** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **All Other States** | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison.  (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). |

© 2017 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

EXHIBIT 2

XL 80 24 03 03

**Endorsement No.: 1**                                    **Effective: October 21, 2017**
**Named Insured: Amtrust Financial Services, Inc.**        **12:01 A.M. Standard Time**
**Policy No.:  US00080794DO17A**                           **Insurer: Indian Harbor Insurance Company**


# TERRORISM PREMIUM ENDORSEMENT


Please note: The portion of your annual premium set forth in Item 8. of the Declarations that is attributable to coverage for acts of terrorism is: $ waived.


All other terms, conditions and limitations of this Policy shall remain unchanged.

EXHIBIT 2

**Endorsement No.: 2**
**Named Insured: Amtrust Financial Services, Inc.**
**Policy No.:  US00080794DO17A**

**Effective: October 21, 2017**
**12:01 A.M. Standard Time**
**Insurer: Indian Harbor Insurance Company**

# SERVICE OF PROCESS ENDORSEMENT

Indian Harbor Insurance Company (hereafter referred to as "the Company") pursuant to the provisions of Regulation 41, promulgated by New York (11 NYCRR 27.16) by issuance of this policy hereby appoints the Superintendent of Insurance of the State of New York to be its true and lawful attorney upon whom may be served all lawful process in any proceeding instituted by or on behalf of an insured or beneficiary arising out of this insurance policy. The Company hereby signifies its agreement that service of process in such manner is of the same legal force and validity as personal service of process in New York upon the Company.

For Illinois exposures, the Insurer further designates the Director of the Illinois Division of Insurance and his successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the insured or any beneficiary hereunder arising out of an Illinois exposure and this contract of insurance.

All other terms and conditions of this policy remain unchanged.

IHIC-NYSOP (02/07)

EXHIBIT 2

BR 83 63 11 16

**Endorsement No.: 3**                          **Effective: October 21, 2017**
**Named Insured: Amtrust Financial Services, Inc.**   **12:01 A.M. Standard Time**
**Policy No.:  US00080794DO17A**                 **Insurer: Indian Harbor Insurance Company**

# GENERAL E&O EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for Loss from any Claim, Interview or Investigation Demand based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty in connection with the rendering of, or actual or alleged failure to render, any services for others for a fee or commission or on any other compensated basis by any person or entity otherwise entitled to coverage under this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2016 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

EXHIBIT 2

XL 83 13 05 00

**Endorsement No.: 4**              **Effective: October 21, 2017**
**Named Insured: Amtrust Financial Services, Inc.**      **12:01 A.M. Standard Time**
**Policy No.:  US00080794DO17A**           **Insurer: Indian Harbor Insurance Company**

# INSURANCE COMPANY ERRORS AND OMISSIONS ENDORSEMENT

In consideration of the premium charged:

(1)  Whenever used in this endorsement, the term "Insurance Contract" means any policy or agreement of insurance, reinsurance or indemnity, including but not limited to bonds, annuities, endowments, pension contracts and risk management self-insurance programs, pools or similar programs.

(2)  No coverage will be available under this Policy for Loss, including Defense Expenses, resulting from any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

    (a)  any actual or alleged refusal to offer, issue or renew, or the cancellation of, any Insurance Contract;

    (b)  any actual or alleged failure or refusal to pay or in the delay in the payment of, benefits due or alleged to have been due under any Insurance Contract;

    (c)  any actual or alleged lack of good faith or unfair dealing in the handling of any claim or obligation under any Insurance Contract, or in the brokering or underwriting of insurance policies or risks;

    (d)  any actual or alleged conduct of the Company or of any Insured Person as an insurance agent or broker in the negotiation, placement or maintenance of any Insurance Contract; or

    (e)  any actual or alleged failure to effect or maintain reinsurance.

All other terms, conditions and limitations of this Policy remain unchanged.

EXHIBIT 2

BR 83 11 03 15

**Endorsement No.: 5**
**Named Insured: Amtrust Financial Services, Inc.**
**Policy No.:  US00080794DO17A**

**Effective: October 21, 2017**
**12:01 A.M. Standard Time**
**Insurer: Indian Harbor Insurance Company**

# PRIOR ACTS EXCLUSION

In consideration of the premium charged, no coverage will be available for any Claim, Interview or Investigation Demand based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any act, error, omission, misstatement, misleading statement, neglect, breach of duty or Wrongful Act committed or allegedly committed prior to October 21, 2017.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2015 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

EXHIBIT 2

BR 83 106 07 17

**Endorsement No.: 6**                              **Effective: October 21, 2017**
**Named Insured: Amtrust Financial Services, Inc.**   **12:01 A.M. Standard Time**
**Policy No.:  US00080794DO17A**                    **Insurer: Indian Harbor Insurance Company**

# SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT OR ACT ENDORSEMENT

In consideration of the premium charged, without in any way limiting the effectiveness of Section III Exclusions (B)(1) and (2) of the Policy, no coverage shall be available under this Policy for any Loss in connection with: (i) any of the Claim(s), Interview(s), Investigation Demand(s), notices, events, investigations or actions set forth in subparagraph (1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16) (hereinafter "Events"); (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) any Event; or (b) any Claim, Interview or Investigation Demand arising from any Event; or (iii) any Wrongful Act, underlying facts, circumstances, acts or omissions in any way relating to any Event.

<u>EVENT(S)</u>

(1)   Erk Erginer, Derivatively on Behalf of Nominal Defendant AmTrust Financial Services, Inc., Plaintiff, v. Michael Karfunkel, George Karfunkel, Barry D. Zyskind, Donald T. DeCarlo, Abraham Gulkowitz, Isaac M. Neuberger, Jay J. Miller, Max G. Caviet, Ronald E. Pipoly, Jr., Maiden Holdings, Ltd., Maiden Insurance Company, Ltd., Defendants and AmTrust Financial Services, Inc., Nominal Defendant. Listed on 10k filed on 3/15/2009
(2)   Tower Group Stockholder Derivative Lawsuit received by AIG on 4/22/2017, Case Number: 13-cv-5852-AT (S.D.N.Y.)
(3)   Cambridge Retirement Systems Stockholder Derivative Action filed on 4/07/2017, Case Number: 10879-CB
(4)   Shaya Lerner Stockholder Derivative Action received by AIG on 2/08/2018, Index Number: 650538/2016
(5)   David Shaev Profit Sharing Plan Stockholder Derivative Action filed on 04/27/2017
(6)   Lily Ding Stockholder Derivative Action filed on 4/19/2017, Case Number : 1:17-cv-00433
(7)   Benjamin Miller Class Action lawsuit recived by AIG on 3/08/2017, Case Number: 2:17-cv-01608
(8)   West Palm Beach Police Pension Fund Stockholder Derivative Action filed on 5/11/2017, Case Number: 1:17-cv-00553
(9)   City of Lauderhill Police Officers Retirement Plan Stockholder Derivative Action filed on 6/28/2017 U.S. District Court for the District of Delaware case number 1:17-cv-00843-UNA
(10)  Pompano Beach Police & Firefighters Retirement System Stockholder Derivative Action filed on 6/28/2017 U.S. District Court for the District of Delaware case number 1:17-cv-00843-UNA
(11)  *In re AmTrust Financial Services, Inc. Securities Litigation* listed on 10Q filed 8/09/2017
(12)  *Miller v. AmTrust, Zyskind, and Pipoly* listed on 10Q filed 8/09/2017
(13)  *Rubel v. AmTrust, Zyskind, and Pipoly*; *Sachetti v. AmTrust, Zyskind, and Pipoly* listed on 10Q 8/09/2017
(14)  *Albano v. AmTrust Financial Services, Inc. et al.* listed on 10Q filed 8/09/2017
(15)  Rikhard Dauber, Pompano Beach Police & Firefighters Retirement System, Nestor Shust, and the City of Lauderhill Police Officers' Retirement Plan Books and Records demands filed in April, May and June, 2017
(16)  Trust Risk Group Dispute listed on 10k filed on 02/29/2016

It is further understood and agreed that no coverage shall be available under this Policy for any Loss in connection with:

(A)   any restatement, retraction, amendment or revision of in part or in whole:

   (i)      any document or statement filed or submitted or required to be filed or submitted with the Securities and Exchange Commission or any other similar federal, state or local agency (including but limited to any 10Ks, 10Qs or annual reports); or

   (ii)     any written or oral statement made regarding the assets, revenues, sales or financial conditions of the Company,

© 2017 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

EXHIBIT 2

based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Event or the resolution of said Event; and

B)   any Claim, Interview or Investigation Demand based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an Interrelated Wrongful Act, regardless of whether or not such Claim, Interview or Investigation Demand involved the same or different Insureds, the same or different legal causes of action or the same or different claimants or is brought in the same or different venue or resolved in the same or different forum.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2017 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

EXHIBIT 2

XL 80 72 06 13

**Endorsement No.: 7**                    **Effective: October 21, 2017**
**Named Insured: Amtrust Financial Services, Inc.**    **12:01 A.M. Standard Time**
**Policy No.:  US00080794DO17A**              **Insurer: Indian Harbor Insurance Company**

# LINKED LIMIT ENDORSEMENT

In consideration of the premium charged, the Insured agrees with the Insurer that the total of all limits of liability under this Policy and any and all other insurance policies issued or reinsured by the Insurer or its affiliates scheduled hereunder to the Insured or any of the Insured's worldwide affiliates, officers, directors, or employees, (this Policy together with all such other policies being referred to herein as "Program Policies") shall not exceed the amount of the Program Aggregate Limit indicated below:

**Program Aggregate Limit**:  $5,000,000

**Schedule of Program Policies:** (list all policies below):

|          | Named Insured | Issuing XL Group Insurer | Policy Number | Policy Period |
|----------|---------------|--------------------------|---------------|---------------|
| Policy 1 | Amtrust Europe Ltd | XL Insurance Company SE | GB00072074DO17A | October 21, 2017 – October 21, 2018 |
| Policy 2 | Shanghai First Response Serivce Company Limited | Ping An Property & Casualty Insurance Company of China, Ltd. | HK00015582DO17A | October 21, 2017 – October 21, 2018 |
| Policy 3 | Amtrust International Underwriters, LTD | XL Insurance Company SE | IE00018434DO17A | October 21, 2017 – October 21, 2018 |
| Policy 4 | Amtrust Insurance Luxembourg SA | XL Insurance Company SE | NL00007339DO17A | October 21, 2017 – October 21, 2018 |
| Policy 5 | All Insurance Management Limited | XL Specialty Insurance Company | US00081230DO17A | October 21, 2017 – October 21, 2018 |

In the event that any payment is made under this Policy or any other Program Policy with the effect that the Program Aggregate Limit is exceeded, the Insured under this Policy shall immediately upon the request of the Insurer pay to the Insurer the sum of such excess.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2013 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

EXHIBIT 2

**XL 80 74 07 13**

**Endorsement No.: 8**
**Named Insured: Amtrust Financial Services, Inc.**
**Policy No.:  US00080794DO17A**

**Effective: October 21, 2017**
**12:01 A.M. Standard Time**
**Insurer: Indian Harbor Insurance Company**

# SIMULTANEOUS TERMINATION ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that if this Policy is canceled pursuant to Section VI General Conditions (E)(1) or (E)(2) of the Policy, any and all other insurance policies issued or reinsured by the Insurer or its affiliates scheduled below to the Insured or any of the Insured's worldwide affiliates, officers, directors, or employees, (this Policy together with all such other policies being referred to herein as "Program Policies"), shall be deemed terminated and cancelled automatically and simultaneously with this Policy.

**Schedule of Program Policies:**

| # | Named Insured | Issuing XL Group Insurer | Policy Number | Policy Period |
|---|---|---|---|---|
| 1 | Amtrust Europe Ltd | XL Insurance Company SE | GB00072074DO17A | October 21, 2017 – October 21, 2018 |
| 2 | Shanghai First Response Serivce Company Limited | Ping An Property & Casualty Insurance Company of China, Ltd. | HK00015582DO17A | October 21, 2017 – October 21, 2018 |
| 3 | Amtrust International Underwriters, LTD | XL Insurance Company SE | IE00018434DO17A | October 21, 2017 – October 21, 2018 |
| 4 | Amtrust Insurance Luxembourg SA | XL Insurance Company SE | NL00007339DO17A | October 21, 2017 – October 21, 2018 |
| 5 | All Insurance Management Limited | XL Specialty Insurance Company | US00081230DO17A | October 21, 2017 – October 21, 2018 |

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2013 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

EXHIBIT 2

XL 80 75 07 14

| | |
|---|---|
| Endorsement No.: 9 | Effective: October 21, 2017 |
| Named Insured: Amtrust Financial Services, Inc. | 12:01 A.M. Standard Time |
| Policy No.:  US00080794DO17A | Insurer: Indian Harbor Insurance Company |

# WORLDWIDE COVERAGE ENDORSEMENT

In consideration of the premium charged, coverage available under this Policy shall extend outside the United States of America, its territories or possessions anywhere in the world where legally permissible on an admitted basis or under the following alternate bases of coverage:

A.   Permissible Unlicensed Coverage

Coverage shall be provided on an unlicensed basis under Section I Insuring Agreements (A), (B) and (C) of the Policy within jurisdictions where the Insurer's provision of coverage on an unlicensed basis is permissible via non-admitted, difference in condition, difference in limits coverage and/or pursuant to any relevant law or regulation applicable to the placement of coverage in the relevant jurisdiction;

or

B.   Financial Interest Coverage

Coverage shall be provided to the Parent Company for its financial interests pursuant to Section I Insuring Agreements (B) and (C) of the Policy located within jurisdictions where:

(i)     applicable law or regulation do not, to the best of the Insurer's good faith knowledge, allow it to provide coverage;  and/or

(ii)    the Parent Company has elected that the Policy will not cover such entity directly but will cover the Parent Company's own financial interest in such entity.

Where the financial interest coverage basis is triggered to indemnify the Parent Company under this Policy, the Insurer and Parent Company agree that:

(iii)   the Parent Company has a financial interest in the Companies intended to be covered under Section I Insuring Agreements (B) and (C) of the Policy because the Parent Company benefits financially from the continued operation of these Companies and/or would be prejudiced by loss to, or damage to, or liability incurred by, or to Companies in the operation of its business.  Financial interest includes, but is not limited to, the value of any direct or indirect shareholding of the Parent Company in such Companies intended to be covered under Section I Insuring Agreements (B) and (C) of the Policy;

(iv)   subject to the terms, conditions, limitations and exceptions of this Policy, the Insurer shall indemnify, by way of agreed valuation, the Parent Company in respect of its loss to its financial interest, by payment to the Parent Company of a sum equal to that which would be payable to the Companies intended to be covered under Section I Insuring Agreements (B) and  (C) of the Policy as if a policy with the same terms and conditions of this Policy has been issued to such Companies in respect of its own interest, less the amount of any indemnity actually received under any policy insuring such Companies in respect of the same interest.

In all events this Endorsement shall not provide coverage to any entity or individual not otherwise provided coverage under the terms, conditions and limitations of the Policy nor is this Endorsement intended to extend or broaden the coverage otherwise available hereunder.

All other terms, conditions and limitations of the Policy shall remain unchanged.

© 2014 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

EXHIBIT 2

**EXECUTIVE AND CORPORATE SECURITIES LIABILITY INSURANCE COVERAGE FORM**

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.
PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Insurer identified in the Declarations (hereinafter the "Insurer"), including the Application, and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer, the Insured Persons and the Company agree as follows:

## I.      INSURING AGREEMENTS

(A)    The Insurer shall pay on behalf of the **Insured Persons Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** for a **Wrongful Act,** except for **Loss** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(B)    The Insurer shall pay on behalf of the **Company Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** for a **Wrongful Act** to the extent the **Company** is required or permitted to pay on behalf of the **Insured Persons** as indemnification.

(C)    The Insurer shall pay on behalf of the **Company Loss** resulting solely from any **Securities Claim** first made against the **Company** during the **Policy Period** for a **Wrongful Act.**

(D)    The Insurer shall pay on behalf of the **Insured Persons Defense Expenses** resulting from an **Interview,** except for **Defense Expenses** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(E)    The Insurer shall pay on behalf of the **Company Defense Expenses** incurred by the **Insured Persons** resulting from an **Interview** to the extent the **Company** is required or permitted to pay on behalf of the **Insured Persons** such **Defense Expenses.**

(F)    The Insurer shall pay on behalf of the **Company Defense Expenses** incurred by the **Company** resulting from any **Investigation Demand** first made during the **Policy Period**.

## II.      DEFINITIONS

(A)    "**Application**" means:

(1)    any application, including attachments thereto, or any written information or representation, provided to the Insurer by or on behalf of an **Insured** in connection with the underwriting of this Policy; and

(2)    any publicly available document filed by the **Company** with the U.S. Securities and Exchange Commission or any state, local or foreign equivalent during the twelve (12) months preceding this Policy's Inception Date.

(B)    "**Change In Control**" means:

(1)    the merger or acquisition of the **Parent Company**, or of all or substantially all of its assets by another entity such that the **Parent Company** is not the surviving entity; or

(2)    any person, entity or an affiliated group of persons or entities acting together,  acquire (a) interest representing more than fifty percent (50%) of the voting, appointment or designation power for the selection of the majority of the directors, management committee members or members of the board of managers of the **Parent Company**, as applicable to its organization, or (b) such rights pursuant to written contract or the by-laws, charter, operating agreement or similar document of the **Parent Company**;

*© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.*

EXHIBIT 2

(C)    "**Claim**" means:

    (1)    any written demand (other than an **Investigation Demand**) for:

        (a)    monetary or non-monetary relief, including injunctive relief; or

        (b)    arbitration,  mediation or other alternative dispute resolution proceeding;

    (2)    any civil, criminal, administrative or regulatory proceeding commenced by:

        (a)    service of a complaint or similar pleading;

        (b)    return of an indictment, information, notice of charges or similar document;

        (c)    an official written request for extradition of any **Insured Person** or the execution of a warrant for the arrest of any **Insured Person** where such execution is an element of extradition**;**

    (3)    any investigation of an **Insured Person** commenced by a written statement from an **Enforcement Authority** identifying such **Insured Person** as the subject of an investigation, including any target letter, Wells Notice or similar document;

    (4)    any subpoena served upon an **Insured Person** for testimony or documents in connection with a formal or informal investigation of the **Company** by any **Enforcement Authority**; and

    (5)    any **Corporate Manslaughter Charge**.

(D)    "**Company**" means the **Parent Company** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the **Policy Period**, subject to GENERAL CONDITIONS VI (D). The term **Company** shall include any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States Bankruptcy Code or any equivalent provision in any foreign jurisdiction.

(E)    "**Corporate Manslaughter Charge**" means a formal criminal proceeding commenced in the United Kingdom against an **Insured Person** of the **Company** domiciled or incorporated in the United Kingdom for involuntary manslaughter (including constructive manslaughter or gross negligence manslaughter) in his or her capacity as a director or officer of the **Company** and directly related to the business of the **Company**.

(F)    "**Defense Expenses**" means reasonable and necessary legal fees, expenses and other costs (including experts' fees):

    (1)    incurred in the investigation, adjustment, settlement, defense and/or appeal of any **Claim, Investigation Demand** or **Interview**, including any preparation for such an **Interview**;

    (2)    incurred due to the arrest and detainment or incarceration of any **Insured Person** in his or her capacity as a director or officer of the **Company** and directly related to the business of the **Company**;

    (3)    incurred in connection with any **Claim** under section 304 of the Sarbanes-Oxley Act of 2002 or imposed pursuant to section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act; or

    (4)    incurred in the defense of any **Corporate Manslaughter Charge**;

**Defense Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers or employees.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

EXHIBIT 2

(G)     "**Employment Practices Wrongful Act**" means any actual or alleged:

     (1)     wrongful termination of employment whether actual or constructive;

     (2)     employment discrimination of any kind, including violation of any federal, state or local law involving employment or discrimination in employment, which would deprive or potentially deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee because of such person's race, color, religion, age, sex, national origin, disability, pregnancy, or other protected status;

     (3)     sexual or other harassment in the workplace; or

     (4)     wrongful deprivation of career opportunity, employment related misrepresentations, retaliatory treatment against an employee of the **Company**, failure to promote, demotion, wrongful discipline or evaluation, refusal to hire, negligent hiring, or negligent supervision.

(H)     "**Enforcement Authority**" means any federal, state, local or foreign law enforcement or governmental regulatory authority, including the United States Departments of Justice and Labor, Securities and Exchange Commission, attorneys general, or the enforcement unit of any securities exchange or similar self-regulatory organization.

(I)     "**Insured**" means the **Insured Persons** and the **Company**.

(J)     "**Insured Person**" means:

     (1)     any past, present or future natural person director or officer, or member or manager of the board of managers, of the **Company** and those persons serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States;

     (2)     any past, present or future natural person employee of the **Company** (other than an individual described in (J)(1) above) to the extent any **Claim** is: (a) a **Securities Claim**, or (b) made and maintained against both such employee and an **Insured Person** as defined in (J)(1) above;

     (3)     an individual identified in (J)(1) above who, with the consent of the **Company**, is or was serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity**; or

     (4)     any individual identified in (J)(1) above who, with the consent of the **Company** is or was serving in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**.

In addition:

In the event of the death, incapacity or bankruptcy of any individual identified above, any **Claim** against the estate, heirs, legal representatives or assigns of such individual for a **Wrongful Act** of such individual will be deemed to be a **Claim** against such individual.

The coverage otherwise available under this Policy to any **Insured Person** will be extended to such **Insured Person's** lawful spouse or domestic partner, but only to the extent such spouse or domestic partner is a party to any **Claim** solely in his or her capacity as a spouse or domestic partner of such persons and only for the purposes of any **Claim** seeking damages recoverable from marital community property, property jointly held by any such person and spouse or domestic partner, or property transferred from any such person to the spouse or domestic partner.

(K)     "**Interrelated Wrongful Acts**" means any **Wrongful Acts**, based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related facts, series of related facts, circumstances, situations, transactions or events.

                       .
© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

EXHIBIT 2

(L)     "**Interview**" means:

    (1)     a written request first received by an **Insured Person** during the **Policy Period** for a voluntary interview, meeting or sworn statement by:

        (a)     any **Enforcement Authority**; or

        (b)     the **Company** in connection with an **Investigation Demand** or an investigation or other inquiry of the **Company** by an **Enforcement Authority**; or

    (2)     an arrest or confinement of an **Insured Person** during the **Policy Period** to a specified residence or secure custodial premises operated by an **Enforcement Authority**, but only in connection with the business of the **Company** or an **Insured Person's** capacity as such or due to his/her status as such;

provided that **Interview** will not include: any document production or discovery in a legal proceeding; any request that is part of any routine or regularly scheduled oversight, compliance, audit, inspection or examination; or any request that is part of an employment-related investigation or **Claim**.  Any **Interview** as defined in (L)(1) above first received, or as defined in (L)(2) above, occurring, prior to the Inception Date of this Policy are not covered under this Policy.

(M)     "**Investigation Demand**" means an investigation by the **Company** to determine whether it is in its best interest to prosecute the allegations made by a security holder of the **Company** in a derivative demand or action.  An **Investigation Demand** shall be deemed first made upon the earlier of: receipt of such allegations by the **Company** or service of a civil complaint or similar proceeding setting forth such allegations.

(N)     "**Joint Venture**" means any corporation, partnership, joint venture, association or other entity, other than a **Subsidiary**, during any time in which the **Parent Company**, either directly or through one or more **Subsidiary(s)**;

    (1)     owns or controls at least thirty-three percent (33%), but not more than fifty percent (50%), in the aggregate of the outstanding securities or other interests representing the present right to vote for the election or appointment of those persons of such an entity occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**; or

    (2)     has the right, by written contract, ownership of securities or otherwise, to elect, appoint or designate at least thirty-three percent (33%) of those persons described in (N)(1) above.

(O)     "**Loss**" means damages, judgments, settlements, pre-judgment and post-judgment interest or other amounts (including punitive, exemplary or multiplied damages, where insurable by law) that any **Insured** is legally obligated to pay and **Defense Expenses**, including that portion of any settlement which represents the claimant's attorneys' fees. **Loss** will not include that portion which constitutes:

    (1)     fines, penalties or taxes imposed by law; provided that **Loss** will specifically include:

        (a)     civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(b) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(b), the United Kingdom's Bribery Act 2010 (2010 chapter 23), and Section 308 of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246(a)); and

        (b)     solely with respect to **Loss** to which Insuring Agreement (A) applies, fines, penalties or taxes that an **Insured Person** is obligated to pay if such fines, penalties or taxes are insurable by law and are imposed in connection with such **Insured Person's** service with an insolvent **Company;**

    (2)     costs incurred by an **Insured** to comply with an order for non-monetary relief (including injunctive relief) or with any agreement to provide such relief;

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

EXHIBIT 2

(3)    any amount which is uninsurable under the law pursuant to which this Policy is construed; provided that the Insurer will not assert that the portion of any settlement or judgment in a **Claim** arising from an initial or subsequent public offering of the **Company's** securities constitutes uninsurable loss due to the alleged violations of Section 11 and/or 12 of the Securities Act of 1933 as amended (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933);

(4)    any amount arising out of the cleanup, containing, treating, testing, removing, disposing, assessing, monitoring or similar costs relating to pollution, contaminants, waste of any kind, pollutants, product defects that result in the release of hazardous materials or pollutants, or any other hazardous materials;

(5)    any amount which represents or is substantially equivalent to an increase in the consideration paid, or proposed to be paid, by the **Company** in connection with its purchase of any securities or assets of any person, group of persons, or entity;

(6)    the return of any amounts required to be paid by an **Insured Person** pursuant to section 304 of the Sarbanes-Oxley Act of 2002 or promulgated under Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act;

NOTE:  With respect to judgments in which punitive, exemplary or multiplied damage are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law. If, based on the written opinion of counsel for the **Insured**, punitive, exemplary or multiplied damages are insurable under applicable law, the Insurer will not dispute the written opinion of counsel for the **Insured**.

(P)    "**Non-Profit Entity**" means any not-for-profit entity or not-for-profit organization.

(Q)    "**Parent Company**" means the entity named in ITEM 1 of the Declarations.

(R)    "**Policy Period**" means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date.  **Policy Period** will include any Optional Extension Period, if applicable.

(S)    "**Securities Claim**" means a **Claim**, other than an administrative or regulatory proceeding against or investigation of the **Company**:

(1)    made against any **Insured** for any actual or alleged violation of any federal, state or local statute,  regulation, or rule or common law regulating securities, including but not limited to the purchase or sale of, or offer to purchase or sell, securities, which is:

(a)    brought by any person or entity resulting from, the purchase or sale of, or offer to purchase or sell, securities of the **Company**; or

(b)    brought by a security holder of the **Company** with respect to such security holder's interest in securities of the **Company**; or

(2)    brought derivatively on behalf of the **Company** by a security holder of the **Company**.

Notwithstanding the foregoing, the term **Securities Claim** shall include an administrative or regulatory proceeding against, or a formal investigation of, the **Company**, but only if and only during the time that such formal investigation or proceeding is also maintained against an **Insured Person**.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

EXHIBIT 2

(T)     "**Subsidiary**" means any entity during any time in which the **Parent Company** holds directly or indirectly:

    (1)     more than fifty percent (50%) of the voting rights or issued share capital of such entity;

    (2)     between twenty percent (20%) and fifty percent (50%) of the voting rights or issued share capital, together with control of the management of such entity; or

    (3)     the right to appoint or remove a majority of the Board of Directors of such entity.

(U)     "**Wrongful Act**" means:

    (1)     any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by an **Insured Person** while acting in his or her capacity as such or due to his or her status as such;

    (2)     solely with respect to a **Claim** as defined in Definition (C)(4) of the Policy, any other matter concerning an **Insured Person** solely by reason of his or her capacity as such or due to his or her status as such;

    (3)     solely with respect to Insuring Agreement (C) of the **Policy,** any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by the **Company**; or

    (4)     any **Employment Practices Wrongful Act** by an **Insured Person** while acting in his or her capacity as such or due to his or her status as such.

Solely with respect to determining whether a securities holder derivative lawsuit which names the **Company** as a defendant (including as a nominal defendant) is a **Securities Claim** against such **Company** for purposes of Insuring Agreement (C) of the Policy, any **Wrongful Act** as defined in subparagraph (U)(1) above will also be deemed to be a **Wrongful Act** of the **Company**; provided that this provision shall not be deemed to create coverage under this Policy for **Loss** from any **Investigation Demand** pursuant to Insuring Agreement (F) of the Policy.  Any such coverage shall only be available pursuant to Insuring Agreement (F) of the Policy.

## III.     EXCLUSIONS

(A)     No coverage shall be available under this Policy for that portion of any **Claim**, **Interview** or **Investigation Demand** made against an **Insured**:

    (1)     for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any property including loss of use thereof; however, this Exclusion (A)(1) will not apply to: (a) any allegations of libel, slander, defamation, mental anguish or emotional distress if and only to the extent that such allegations are made as part of a **Claim** for an **Employment Practices Wrongful Act**;  (b) any **Securities Claim**; (c) for **Corporate Manslaughter Charges**; or (d) any **Claim** to the extent coverage is provided under Insuring Agreement, (A) of the Policy;

    (2)     for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA) as amended or any regulations promulgated thereunder or any similar law, federal, state or local law or regulation in connection with any pension, profit sharing or employee benefit program established and/or sponsored by the **Company** in whole or in part for the benefit of the directors, officers or employees of the **Company**;

©2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

EXHIBIT 2

(3)     by, on behalf of, or at the direction of the **Company,** or any **Joint Venture** or **Non-Profit Entity** (but with respect to the **Joint Venture** or **Non-Profit Entity**, only against an **Insured Person** for a **Wrongful Act** while acting in his or her capacity as a director, officer, trustee, regent or governor of such **Joint Venture** or **Non-Profit Entity**, or  as a person occupying an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated of the **Joint Venture**); however, this Exclusion (A)(3) will not apply to:

    (a)     the extent a **Claim** is brought derivatively by a security holder of the **Company**, or by any **Joint Venture** or **Non-Profit Entity** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of any **Insured Person** unless such solicitation, assistance, participation or intervention is protected pursuant to Section 806 of the Sarbanes-Oxley Act of 2002 or any similar whistleblower statute**,** or the **Company**, or any **Joint Venture** or **Non-Profit Entity**;

    (b)     the extent a **Claim** or **Interview** is brought by the Bankruptcy Trustee or Examiner of the **Company**, or by  any **Joint Venture** or **Non-Profit Entity** or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the **Company, Joint Venture**, or **Non-Profit Entity**;

    (c)     the extent a **Claim** is brought and maintained in a non-common law jurisdiction outside the United States of America, including its territories and possessions;

    (d)     the extent a **Claim** or **Interview** is brought by a Creditors Committee of the **Company**, or any **Joint Venture** or **Non-Profit Entity** in the event the **Company**, **Joint Venture**, or **Non-Profit Entity** files for relief under Title 11 of the United States Code;

    (e)     **Defense Expenses** covered under Insuring Agreement (A) or (D).

(B)     No coverage shall be available under this Policy for any **Claim**, **Interview** or **Investigation Demand** made against an **Insured**:

    (1)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration against an **Insured** which was brought prior to the Pending and Prior Litigation Date set forth in ITEM 6 of the Declarations;

    (2)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy;

    (3)     brought about or contributed to in fact by any:

    (a)     deliberately fraudulent or deliberately criminal act or omission or any willful violation of any statute, rule or law by an **Insured**; or

    (b)     profit or remuneration gained by an **Insured** to which such **Insured** is not legally entitled,

    as determined by a final, non-appealable adjudication in the underlying action; however this Exclusion (B)(3) will not apply to: (i) allegations in a **Claim** asserted against an **Insured** under Section 11 and/or 12 of the Securities Act of 1933 as amended arising out of an initial or subsequent public offering of the **Company's** securities (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933); or (ii) **Defense Expenses** incurred in connection with a

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

EXHIBIT 2

**Claim** alleging violations of section 304 of the Sarbanes-Oxley Act of 2002 or section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act;

No conduct of any **Insured** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS. Only the conduct of the chief executive officer and/or chief financial officer of the **Company** will be imputed to the **Company**.

## IV.   LIMIT OF LIABILITY, INDEMNIFICATION AND RETENTIONS

(A)   The Insurer shall pay the amount of **Loss** in excess of the applicable Retention(s) set forth in ITEM 4 of the Declarations up to the Limit of Liability set forth in ITEM 3(B) of the Declarations.

(B)   The amount set forth in ITEM 3(B) of the Declarations shall be the maximum aggregate Limit of Liability of the Insurer under this Policy whether any **Loss** is covered under one or more Insuring Agreements. Payment of **Loss**, including **Defense Expenses**, by the Insurer shall reduce the Limit of Liability.

(C)   The amount set forth in Item 3(A) of the Declarations shall be the maximum aggregate limit of liability of the Insurer under this Policy resulting from all **Investigation Demands** first made during the **Policy Period**, which amount is part of, and not in addition to, the maximum aggregate Limit of Liability for the Policy as set forth in Item 3(B) of the Declarations.

(D)   With respect to the **Company**'s indemnification of its **Insured Persons**, the certificate of incorporation, charter, by-laws, articles of association, or other organizational documents of the **Parent Company**, each **Subsidiary** and each **Non-Profit Entity** or **Joint Venture**, will be deemed to require indemnification to the **Insured Persons** to the fullest extent permitted by law.

(E)   No Retention will be applicable to **Loss**, including **Defense Expenses**, under Insuring Agreements, (A), (D) or (F).  In the event of financial insolvency of the **Company**, no Retention shall apply.

(F)   In the event the **Company** is obligated under the Policy to pay any Retention, the **Company** may satisfy such Retention from any source. As a precondition to such recognition of the erosion of the Retention from any source other than by payment by the **Company**, the **Company** shall provide the Insurer with written proof, to the Insurer's satisfaction, that payment of such Retention has been made.

(G)   If more than one retention is applicable to different portions of **Loss**, including **Defense Expenses**, the applicable Retention(s) will be applied separately to each portion of such **Loss**, and the sum of such Retention(s) will not exceed the largest applicable Retention set forth in ITEM 4 of the Declarations.

## V.   DEFENSE, SETTLEMENT AND ALLOCATION OF LOSS

(A)   It shall be the duty of the **Insured** and not the duty of the Insurer to defend any **Claim**, **Interview** or **Investigation Demand** under this Policy.

(B)   No **Insured** may incur any **Defense Expenses** in connection with any **Claim, Interview** or **Investigation Demand**, or admit liability for, make any settlement offer with respect to, or settle any **Claim** without the Insurer's consent, such consent not to be unreasonably delayed or withheld; however, the **Insured** may settle a **Claim** without such consent, if the total amount of such settlement and **Defense Expenses** does not exceed fifty percent (50%) of the amount of the applicable Retention(s) for such **Claim**.

(C)   Upon the written request of an **Insured**, the Insurer will advance **Defense Expenses** on a current basis, but no less so than quarterly, excess of the applicable Retention, before the disposition of the **Claim, Interview** or **Investigation Demand** for which this Policy provides coverage. As a condition of the advancement of **Defense Expenses**, each **Insured** agrees that if and to the extent it is determined that such **Defense Expenses** are not insured under this Policy, such **Defense Expenses** shall be repaid to the Insurer by the **Insureds**, severally according to their respective interests.

*© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.*

EXHIBIT 2

(D)     If both **Loss** covered by this Policy and loss not covered by this Policy are incurred, either because a **Claim, Interview** or **Investigation Demand** made against the **Insured** contains both covered and uncovered matters, or because a **Claim, Interview** or **Investigation Demand** is made against both the **Insured** and others (including the **Company** for **Claims** other than **Securities Claims**) not insured under this Policy, the **Insured** and the Insurer will use their best efforts to determine a fair and appropriate allocation of **Loss** between that portion of **Loss** that is covered under this Policy and that portion of loss that is not covered under this Policy. Additionally, the **Insured** and the Insurer agree that in determining a fair and appropriate allocation of **Loss**, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim, Interview** or **Investigation Demand** by, the **Insured** and others.

(E)     In the event that an agreement cannot be reached between the Insurer and the **Insured** as to an allocation of **Loss**, as described in (D) above, then the Insurer shall advance that portion of **Loss** which the **Insured** and the Insurer agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

## VI.     GENERAL CONDITIONS

(A)     **NOTICE**

(1)     As a condition precedent to any right to payment under this Policy with respect to any **Claim** or **Investigation Demand**, the **Insured** shall give written notice to the Insurer of each **Claim** or **Investigation Demand** as soon as practicable after it is first made, including but not limited to written notice as soon as practicable of each **Claim** or **Investigation Demand** deemed to constitute a single **Claim** or **Investigation Demand** pursuant to Section VI (B) below.  Such notice shall be provided as soon as practicable after the risk management or general counsel departments of the **Parent Company** first becomes aware of such **Claim** or **Investigation Demand**.  In the event that the **Insureds** fail to provide timely notice to the Insurer under this Section VI (A)(1), the Insurer shall not be entitled to deny coverage solely based on such untimely notice unless the Insurer can demonstrate its interests were materially prejudiced by reason of such untimely notice.

(2)     As a condition precedent to any right to payment under this Policy with respect to any **Interview**, the **Insured** may elect to give the Insurer written notice thereof during the **Policy Period** pursuant to Section VI (A)(4) below.

(3)     If, during the **Policy Period,** the **Insured** provides the Insurer with written notice of:

(a)     a specific **Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, and the circumstances by which the **Insured** first became aware of such **Wrongful Act**;

(b)     its receipt of a request to toll or waive a statute of limitations in connection with a **Wrongful Act**; or

(c)     an **Interview** first received during the **Policy Period**,

then any **Claim** or **Investigation Demand** subsequently made arising out of such **Wrongful Act**, request to toll or waive a statute of limitation or **Interview** will be treated as if it had been first made during the **Policy Period,** provided written notice of any subsequent **Claim** or **Investigation Demand** is provided to the Insurer as soon as practicable after such **Claim** or **Investigation Demand** is made.

(4)     All notices under Section VI (A)(1),(2) and (3) above must be sent by:

(a)     first class U.S. mail, overnight mail or the equivalent to the address set forth in ITEM 7 of the Declarations:  Attention Claim Department; or

(b)     electronic mail (email) to the address shown in ITEM 7 of the Declarations.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

EXHIBIT 2

(B)     **INTERRELATED CLAIMS**

All **Claims, Investigation Demands, Interviews** or requests to toll or waive a statute of limitations, arising from the same **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim, Investigation Demand** or **Interview** and shall be deemed to have been made at the earliest of the time at which the earliest such **Claim, Investigation Demand,** or **Interview** is made or deemed to have been made pursuant to Section VI (A) above.

(C)     **OTHER INSURANCE AND SERVICE IN CONNECTION WITH NON-PROFIT ENTITIES AND JOINT VENTURES**

(1)     Subject to Section IV LIMIT OF LIABILITY INDEMNIFICATION AND RETENTIONS (F), all coverage under this Policy will be specifically excess of and will not contribute with any other valid and collectible management liability insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy, or a personal umbrella policy or personal directorship liability policy purchased by an **Insured Person**. This Policy will not be subject to the terms of any other insurance policy.

(2)     All coverage under this Policy for **Loss** from **Claims** and **Interviews** made against the **Insured Persons** while acting in their capacity as a director, officer, trustee, regent or governor of a **Non-Profit Entity** or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of the **Insured Persons** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture** will be specifically excess of and will not contribute with, any other insurance or indemnification available to such **Insured Person** from such **Non-Profit Entity** or **Joint Venture** by reason of his or her service as such.

(D)     **MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL)**

(1)     If during the **Policy Period** the **Company** acquires any entity by merger, consolidation or otherwise such that the entity becomes a **Subsidiary**, coverage shall be provided for any **Loss** involving a **Claim**, **Interview** or **Investigation Demand** for a **Wrongful Act** occurring after the consummation of the transaction.

(2)     If, however, by reason of the transaction (or series of transactions) described in (D)(1) above, the assets or liabilities so acquired or so assumed as a result of such acquisition, exceed thirty-five percent (35%) of the total assets or liabilities, respectively, of the **Company**, as represented in the **Company's** most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days or to the Expiration Date, whichever occurs first, for any **Loss** involving a **Claim**, **Interview** or **Investigation Demand** for a **Wrongful Act** that occurred after the transaction has been consummated. Coverage beyond such period will be provided only if:

(a)     the Insurer receives written notice containing full details of the transaction(s); and

(b)     the Insurer at its sole discretion, agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate.

(3)     With respect to the acquisition, assumption, merger, consolidation or otherwise of any entity as described in (D)(1) and (2) above, there will be no coverage available to the **Company**, an **Insured Person**,  or to the acquired entity under this Policy for **Claims** made against the **Company** ,  an **Insured Person**, or the acquired  entity,   for a **Wrongful Act** committed any time during which such entity,  is not an **Insured**.

(4)     If any entity ceases to be a **Subsidiary**, the coverage provided under this Policy shall continue to apply to the **Insured Persons** who, because of their service with such **Subsidiary**, were covered under this Policy but only with respect to a **Claim** for a **Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Company**.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

EXHIBIT 2

(5)    If during the **Policy Period** there is a **Change In Control**, the coverage provided under this Policy shall continue to apply but only with respect to a **Claim** against an **Insured** for a **Wrongful Act** committed or allegedly committed up to the time of the **Change In Control**; and

    (a)    coverage will cease with respect to any **Claim** for a **Wrongful Act** committed subsequent to the **Change In Control**; and

    (b)    the entire premium for the Policy will be deemed to be fully earned immediately upon the consummation of a **Change In Control.**

(E)    **CANCELLATION AND RENEWAL OF COVERAGE**

(1)    Except for the nonpayment of premium, as set forth in (E)(2) below, the **Parent Company** has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations. In such event, the Insurer shall retain the customary short rate portion of the earned premium. Return or tender of the unearned premium is not a condition of cancellation.

(2)    The Insurer may only cancel this Policy for nonpayment of premium. The Insurer will provide not less than twenty (20) days written notice stating the reason for cancellation and when the Policy will be canceled. Notice of cancellation will be sent to the **Parent Company** and the agent of record for the **Insured,** if applicable.

(3)    The Insurer is under no obligation to renew this Policy upon its expiration. Once the Insurer chooses to non-renew this Policy, the Insurer will deliver or mail to the **Parent Company** written notice stating such at least sixty (60) days before the Expiration Date set forth in ITEM 2 of the Declarations.

(F)    **OPTIONAL EXTENSION PERIOD**

(1)    If either the **Parent Company** or the Insurer does not renew this Policy, the **Parent Company** or any **Insured Person** shall be entitled, upon payment of an additional premium set forth in ITEM 5 of the Declarations, to an extension of the coverage provided by this Policy with respect only to any **Claim** or **Investigation Demand** first made or deemed first made during the period of time set forth in ITEM 5 of the Declarations after the Policy Expiration Date, but only with respect to a **Wrongful Act** occurring prior to the Policy Expiration Date. Any such **Claim** or **Investigation Demand** shall be deemed to have been made during the **Policy Period**.

(2)    As a condition precedent to the right to purchase the Optional Extension Period, the total premium for this Policy must have been paid in full. The right of the **Parent Company** or any **Insured Person** to purchase the Optional Extension Period will be immediately terminated if the Insurer does not receive written notice by the **Parent Company** or **Insured Person** advising it wishes to purchase the Optional Extension Period together with full payment of the premium for the Optional Extension Period within thirty (30) days after the Policy Expiration Date.

(3)    If the **Parent Company** or **Insured Person** elects to purchase the Optional Extension Period as set forth in (F)(1) and (2) above, the entire premium for the Optional Extension Period will be deemed to be fully earned at the Inception Date for the Optional Extension Period.

(4)    The purchase of the Optional Extension Period will not in any way increase the Limit of Liability set forth in ITEM 3 of the Declarations, and the Limit of Liability with respect to **Claims** made during the Optional Extension Period shall be part of and not in addition to the Limit of Liability for all **Claims**, **Interviews** and **Investigation Demands** made during the **Policy Period.**

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

EXHIBIT 2

(G)     **ASSISTANCE, COOPERATION AND SUBROGATION**

(1)     The **Insured** agrees to provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request in connection with any **Claim**, **Investigation Demand** or **Interview** that is reasonably likely to be covered under this Policy, and further agrees that it will do nothing which in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery against any party.

(2)     In the event of any payment under this Policy, the Insurer will be subrogated to the extent of such payment of **Loss** to all of the **Insured's** rights of recovery; provided that the Insurer will be subrogated to any **Insured's** potential or actual rights of recovery against any **Insured Person** only in the event that Exclusion (B)(3) of the Policy is applicable to such **Insured Person** in connection with such **Loss**. The **Insured** shall execute all papers required and will do everything necessary to secure such rights including but not limited to the execution of such documents as are necessary to enable the Insurer to effectively bring suit in its name, and will provide all other assistance and cooperation which the Insurer may reasonably require. It is understood that the failure of any **Insured Person** to give the Insurer cooperation and information as required in this paragraph shall not impair the rights of the **Company**, or any other **Insured Person** under this Policy.

(3)     In the event the Insurer recovers amounts it paid under this Policy, the Insurer will reinstate the applicable Limits of Liability of this Policy to the extent of such recovery, less the Insurer's costs incurred in obtaining such recovery.  It is understood and agreed that the Insurer shall have no duty to seek such a recovery.

(H)     **EXHAUSTION**

If the Insurer's Limit of Liability as set forth in ITEM 3 of the Declarations is exhausted by the payment of **Loss,** the premium as set forth in ITEM 8 of the Declarations will be fully earned and, subject to Section VI General Condition (G)(3), all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under this Policy.

(I)     **REPRESENTATION CLAUSE**

The **Insured** represents that the statements and particulars contained in the **Application** as well as any prior application submitted to the Insurer are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, form the basis of this Policy. No knowledge or information possessed by any **Insured Person** will be imputed to any other **Insured Person**.  With respect to **Claims** made under Insuring Agreement (C) only, no knowledge or information possessed by any **Insured Person** other than a past or present chief executive officer or chief financial officer of the **Parent Company** will be imputed to the **Company**.  In the event that any of the particulars or statements in the **Application** are untrue, this Policy will be void with respect to any **Insured** who knew of such untruth.

This Policy shall not be rescinded by the Insurer; provided that nothing herein shall limit or waive any other rights or remedies available under the Policy or applicable law.

(J)     **ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY**

(1)     No action may be taken against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms and conditions of this Policy.

(2)     Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any **Claim** against the **Insured** to determine its liability, nor may the **Insured** implead the Insurer in any **Claim**.

(3)     Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

EXHIBIT 2

(4)   Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not cause a waiver or change in any part of this Policy or prevent the Insurer from asserting any right under the terms, conditions and limitations of this Policy. The terms, conditions and limitations of this Policy may only be waived or changed by written endorsement.

(K)   **AUTHORIZATION AND NOTICES**

It is understood and agreed that the **Parent Company** will act on behalf of the **Company** and the **Insured Persons** with respect to:

(1)   the payment of the premiums;

(2)   the receiving of any return premiums that may become due under this Policy;

(3)   the giving of all notices to the Insurer as provided herein; and

(4)   the receiving of all notices from the Insurer.

(L)   **PRIORITY OF PAYMENTS**

In the event of **Loss**, including **Defense Expenses**, payable under more than one of the Insuring Agreements of the Policy, then the Insurer shall, to the maximum extent practicable and subject at all times to the Insurer's maximum aggregate Limit of Liability as set forth in ITEM 3 of the Declarations, pay such **Loss** as follows:

(1)   first, the Insurer shall pay that **Loss**, if any, which the Insurer may be liable to pay on behalf of the **Insured Persons** which the **Company** is not permitted nor required to pay on behalf of the **Insured Persons** as indemnification;

(2)   second, the Insurer shall pay that **Loss**, if any, which the Insurer may be liable to pay on behalf of the **Company** which the **Company** is permitted or required to pay on behalf of the **Insured Persons**; and

(3)   third, the Insurer shall make such other payments which the Insurer may be liable to make under Insuring Agreements (C) and/or (F) or otherwise.

(M)   **BANKRUPTCY**

Bankruptcy or insolvency of any **Insured** shall not relieve the Insurer of any of its obligations under this Policy.  In such event, including any liquidation or reorganization proceeding of the **Company**, then each **Insured** and the Insurer hereby agree not to oppose or object to any efforts by any **Insured Person** to obtain relief from any stay or injunction.

(N)   **ENTIRE AGREEMENT – WORLDWIDE COVERAGE**

(1)   The **Insured** agrees that the Declarations, Policy, including the endorsements, attachments and the **Application**, shall constitute the entire agreement between the Insurer or any of its agents and the **Insured** relating to this insurance.  The coverage afforded by the Policy shall apply anywhere in the world.

(2)   If the **Parent Company** requests management or directors and officers liability policies for issuance to its foreign **Subsidiaries** in their own countries, the Insurer or a subsidiary or affiliate of XL Group plc shall provide a quote to the **Parent Company** for such policies; provided that the Insurer or a subsidiary or affiliate of XL Group plc can support or facilitate the issuance of the policies to such foreign **Subsidiaries** in their applicable foreign countries. Any coordination of coverage under such policies with coverage under this Policy shall be set forth in an endorsement attached to this Policy.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

EXHIBIT 2

(O)     **CURRENCY**

All premiums, limits of liability, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America.  If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than the United States of America, payment of covered **Loss** due under this Policy, subject to its terms, conditions and limitations, will be made either in such other currency (at the option of the Insurer and with the agreement of the **Parent Company**), or, in the United States of America dollars at the rate of exchange most recently published in The Wall Street Journal on the date of the Insurer's obligation to pay such **Loss** is established.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

EXHIBIT 2



EXHIBIT 2



**XL Catlin - Professional Insurance**
100 Constitution Plaza
17th Floor
Hartford, CT 06103
Phone    860-246-1863
Fax       860-246-1899

November 28, 2018

Timothy Molineux
Marsh
1166 Avenue of the Americas
New York, NY  10036

**Re:  Amtrust Financial Services, Inc.**
    **Executive and Corporate Securities Liability Endorsements**

Dear Timothy,

Enclosed, please find the endorsements for **Amtrust Financial Services, Inc.**  Thank you for choosing XL Catlin
- Insurance. Please call if you have any questions or concerns.

Sincerely,

Michael Linehan

EXHIBIT 2

XL 80 20 01 02

**Endorsement No.: 12**  **Effective: November 29, 2018**
**Named Insured: Amtrust Financial Services, Inc.**  **12:01 A.M. Standard Time**
**Policy No.: US00080794DO17A**  **Insurer: Indian Harbor Insurance Company**

# ADD/DELETE AN ENDORSEMENT
# (FOR ADDITIONAL PREMIUM)

In consideration of an additional premium of $1,000,000.00 charged:

(1)   Endorsement No. 3 and Endorsement No. 4 are deleted from this Policy.

(2)   Item 8. of the Declarations is amended to read in its entirety as follows:

   "Item 8. Premium:  $1,597,000.00 Total Policy Premium"

All other terms, conditions and limitations of this Policy shall remain unchanged.

EXHIBIT 2

**BR 83 43 02 16**

**Endorsement No.: 13**         **Effective: November 29, 2018**
**Named Insured: Amtrust Financial Services, Inc.**       **12:01 A.M. Standard Time**
**Policy No.: US00080794DO17A**        **Insurer: Indian Harbor Insurance Company**
**Policy Form: EXECUTIVE AND CORPORATE SECURITIES LIABILITY**

# GENERAL E&O EXCLUSION

In consideration of the premium charged:

(1)    No coverage will be available under this Policy for Loss from any Claim, Interview or Investigation Demand based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty in connection with the rendering of, or actual or alleged failure to render, any services for others for a fee or commission or on any other compensated basis by any person or entity otherwise entitled to coverage under this Policy.

(2)    Paragraph (1) above is not intended, however, nor shall it be construed, to apply to Loss in connection with any Securities Claim brought by a security holder of the Company, or a derivative action brought by or on behalf of, or in the name or right of, the Company, and brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, an Insured.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2016 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

EXHIBIT 2

DO 83 74 06 03

Endorsement No.: 14
Named Insured: Amtrust Financial Services, Inc.
Policy No.: US00080794DO17A

Effective: November 29, 2018
12:01 A.M. Standard Time
Insurer: Indian Harbor Insurance Company

# INSURANCE ERRORS & OMISSIONS EXCLUSION

In consideration of the premium charged:

(1)     Whenever used in this endorsement, the term "Insurance Contract" means any policy or agreement of insurance, reinsurance or indemnity, including but not limited to bonds, annuities, endowments, pension contracts and risk management self-insurance programs, pools or similar programs.

(2)     No coverage will be available under this Policy for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

(a)     the actual or alleged refusal to offer, issue or renew, or the cancellation of, any Insurance Contract;

(b)     the actual or alleged failure or refusal to pay, or delay in the payment of, benefits due or alleged to have been due under any Insurance Contract;

(c)     the actual or alleged lack of good faith or unfair dealing in the handling of any claim or obligation under any Insurance Contract, or the brokering or underwriting of insurance policies or risks;

(d)     the actual or alleged conduct of the Company or any Insured Person as an insurance agent or insurance broker in the negotiation, placement or maintenance of any Insurance Contract;

(e)     the rendering of professional services for others in the Company's capacity as investment counselor, manager or advisor, investment banker, securities broker or dealer, financial planner or analyst, insurance agent or broker, general partner, limited partner or partnership unit distributor, or any similar capacity;

(f)     the sponsorship, ownership, control, management or operation of any investment company required to be registered with the United States Securities and Exchange Commission by the Investment Company Act of 1940;

(g)     the offering or sale of shares in any unit investment trust or management investment company or of variable annuity plans;

(h)     any diminution of assets in connection with the activities described in subparagraphs (2)(f) and (2)(g) above; or

(i)     any actual or alleged failure to effect or maintain reinsurance.

(3)     Paragraph (2) above is not intended, however, nor shall it be construed, to apply to Loss in connection with any Securities Claim brought by a security holder of the Company, or a derivative action brought by or on behalf of, or in the name or right of, the Company, and brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, an Insured.

All other terms, conditions and limitations of this Policy shall remain unchanged.

EXHIBIT 2

**BRX 80 152 09 18**

**Endorsement No.: 15**                              **Effective: November 29, 2018**
**Named Insured: Amtrust Financial Services, Inc.**   **12:01 A.M. Standard Time**
**Policy No.: US00080794DO17A**                       **Insurer: Indian Harbor Insurance Company**
**Policy Form: EXECUTIVE AND CORPORATE SECURITIES LIABILITY**

# AMEND PRIOR ACTS EXCLUSION ENDORSEMENT

In consideration of the premium charged:

(1)     Solely with respect to Claims, Interviews or Investigation Demands first made on or after the Effective Date of this Endorsement, Endorsement No. 5 to this Policy shall be deleted in its entirety.

(2)     It is understood and agreed that with respect to Claims, Interviews or Investigation Demands made on or after the Effective Date of this Endorsement, no coverage will be available under this Policy for Claims, Interviews or Investigation Demands based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act which, before such Effective Date, was the subject of any notice given under this or any other Management Liability policy, Directors and Officers liability policy or similar policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

*© 2018 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.*

EXHIBIT 2

BR 80 179 08 16

**Endorsement No.: 16**  **Effective: November 29, 2018**
**Named Insured: Amtrust Financial Services, Inc.**  **12:01 A.M. Standard Time**
**Policy No.: US00080794DO17A**  **Insurer: Indian Harbor Insurance Company**
**Policy Form: EXECUTIVE AND CORPORATE SECURITIES LIABILITY**

# CONVERT TO RUN-OFF ENDORSEMENT

In consideration of an additional premium of $1,000,000.00 (the "Run-off Premium"):

(1)  The amount of unearned premium for the Original Policy Period, as defined below, is $43,680.00

(2)  Item 2 of the Declarations is amended to read in its entirety as follows:

"Item 2. Policy Period:     From: October 21, 2017     To: November 29, 2024
At 12:01 AM Standard Time at your Mailing Address Shown Above"

(3)  It is expressly understood and agreed that the maximum aggregate Limit of Liability set forth in Item 3 of the Declarations shall continue to be the maximum aggregate Limit of Liability for the entire Policy Period, as amended in paragraph (2) above.

(4)  Item 5 of the Declarations is deleted in its entirety.

(5)  Item 8 of the Declarations is amended to read in its entirety as follows:

"Item 8.  Premium:
  Original Premium:              $597,000.00
  Run-off Premium:              $1,000,000.00
  Unearned Premium:            $43,680.00
  Taxes, Surcharges or Fees:    $0.00
  Total Policy Premium:          $1,553,320.00

(6)  No coverage will be available under this Policy for any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any a Wrongful Act committed or allegedly committed on or after November 29, 2018 or with respect to any Interview or Investigation demand in connection with any act, fact, circumstance, transaction, or event taking place on or after November 29, 2018.

(7)  Section VI General Conditions (D)(5) of the Policy is deleted in its entirety.

(8)  Section VI General Conditions (E)(1) of the Policy is amended to read in its entirety as follows:

"(1)     Except for the nonpayment of premium, as set forth in (E)(2) below, the Parent Company has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice stating when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations."

(9)  Section VI General Conditions (F) of the Policy is deleted in its entirety. All other references in the Policy to the Optional Extension Period are deleted.

(10)  The entire premium for this Policy shall as set forth in paragraph (5) above be deemed fully earned as of November 29, 2018.

(11)  Section VI General Conditions (A)(3) of the Policy is deleted in its entirety.

(12)  Solely for the purposes of this endorsement, the term Original Policy Period means the period of time from October 21, 2017 to November 29, 2018.

All other terms, conditions and limitations of this Policy shall remain unchanged.

BR 80 179 08 16  Page 1 of 1
© 2016 X.L. America, Inc. All Rights Reserved. May not be copied without permission.

EXHIBIT 2