

**BAILEY** | **CAVALIERI**

KEITH A. LITTLE
klittle@baileycav.com
614-229-3264

September 24, 2019

Peter M. Gillon
Pillsbury Winthrop Shaw Pittman LLP
1200 17th Street, NW
Washington, DC 20036
peter.gillon@pillsburylaw.com

**VIA E-MAIL and
REGULAR U.S. MAIL**

Re:  Insurer:       Underwriters at Lloyds, London, Hiscox Syndicate No. 33
   Insured:       AmTrust Financial Services, Inc.
   Policy Nos.:  B0507 N17FA23130 & B0509 FINFW1800559
   Matter:       Consolidated Stockholder Lawsuit

Dear Mr. Gillon:

  We have been retained by Underwriters at Lloyds, London, Hiscox Syndicate No. 33 ("Underwriters") to represent their interests in connection with the above-referenced matter. On behalf of Underwriters, we acknowledge receipt of the Amended Verified Consolidated Class Action Complaint filed in the lawsuit captioned In re AmTrust Financial Services, Inc. Stockholder Litigation, Case No. 2018-0396, Chancery Court of Delaware (the "Consolidated Stockholder Litigation").[1]

  We are directing this letter to you as the authorized insurance representative of AmTrust Financial Services, Inc. ("AmTrust" or the "Company") and the individual Insureds under Excess Insurance Policy Nos. B0509 FINFW1800152[2] and B0507 N17FA24460 (the "Excess Policies") and Excess Insurance Policy No. B0509 FINFW1800559 (the "Excess Run-Off Policy" and, together with the Excess Policies, the "Underwriters Excess Policies").[3] If you are not acting on the Insureds' behalves for insurance coverage purposes, please send a copy of this letter to any

---

[1] Underwriters previously received copies of the following: (1) a Verified Stockholder Class Action Complaint filed in *Cambridge Retirement System, Inc. v. DeCarlo, et al.*, Case No. 2018-0402, Chancery Court of Delaware (the "2018 Cambridge Action"); (2) a Verified Class Action Complaint filed in *Pompano Beach Police, et al. v. Zyskind, et al.*, Case No. 2018-0396, Chancery Court of Delaware (the "2018 Pompano Action"); and (3) a Verified Complaint filed in *Arca Investments, A.S., et al. v. Zyskind, et al.*, Case No. 2019-0144, Chancery Court of Delaware (the "Arca Action"). Those matters have all been consolidated and are now proceeding as the Consolidated Stockholder Litigation.

[2] Policy No. B0507 N17FA23130 was amended to become B0509 FINFW1800152 upon the Insured's change of its broker of record. The terms and conditions contained in those policies are the same.

[3] Underwriters are also a quota-share participant on Excess Side-A Policy No. B0507 N17FA2380, which provides $5 million of Side-A coverage excess of $75 million of underlying coverage. Based on the information and materials currently available, it does not appear that Side-A coverage is currently implicated in this matter. In any event, Underwriters reserves all of its rights under the Excess Side-A Policy and available at law.

Bailey Cavalieri LLC • 10 West Broad Street • Suite 2100 • Columbus, Ohio 43215-3422
P 614.221.3155   F 614.221.0479   W baileycav.com
ATTORNEYS AT LAW

EXHIBIT 7

Peter M. Gillon
September 24, 2019
Page 2

such Insureds or their authorized insurance representative(s) for their information and inform us
with whom we should communicate in the future regarding this matter.

A.    The Underwriters Excess Policies

Underwriters issued the Excess Policies to AmTrust for the period from October 21, 2017
to November 29, 2018 (the "Policy Period").  Subject to their terms, conditions, and exclusions,
the Excess Policies provide coverage for certain Claims first made during the Policy Period.  Such
coverage is excess of any applicable Retention and the underlying coverage (the "Excess
Underlying Limits") provided by the underlying insurers (the "Excess Underlying Insurers") set
forth below:

| Insurer | Limit | Layer |
|---|---|---|
| Indian Harbor Ins. Co. | $5 million | Primary |
| Zurich American Ins. Co. | $5 million | First Excess |
| Axis Ins. Co. | $5 million | Second Excess |
| **Underwriters (Hiscox)** | **$10 million** | **Third Excess** |
| Forge/Chubb/Aspen/Pembroke/ Barbican/Talbot | $15 million | Fourth Excess |
| **Hiscox**/Forge/Chubb/Aspen/ Pembroke/Barbican[4] | $10 million | Fifth Excess |

Pursuant to Insuring Clause I. of the Excess Policies, coverage thereunder shall attach only after
all of the relevant Excess Underlying Limits have been exhausted through payments by, or on
behalf of, or in place of the relevant Excess Underlying Insurers of amounts under the relevant
Excess Underlying Insurance.

Underwriters also issued the Excess Run-Off Policy to AmTrust, effective for a six year
period from November 29, 2018 to November 29, 2024 (the "Run-Off Period"). The Excess Run-
Off Policy provides coverage for certain Claims first made during the Run-Off Period, but solely
with respect to Wrongful Acts occurring prior to November 29, 2018.   Subject to its terms,
conditions, and exclusions, the Excess Run-Off Policy provides up to $5 million in coverage[5]

---

[4] Underwriters Policy No. B0507 N17FA24460 affords up to $2.5 million of the $10 million quota share layer that is
excess of $40 million.

[5] The Excess Run-Off Policy provides that a maximum aggregate Limit of Liability of $10 million shall apply to all
Loss incurred under Policy No. B0507 N17FA23130 (which was amended to become B0509 FINFW1800152) and
the Excess Run-Off Policy, combined.

**BAILEY | CAVALIERI**

EXHIBIT 7

Peter M. Gillon
September 24, 2019
Page 3

excess of any applicable Retention and $20 million in coverage (the "Run-Off Underlying Limit")
provided by the following insurers (the "Run-Off Underlying Insurers"):

| Insurer | Limit | Layer |
|---------|-------|-------|
| Indian Harbor Ins. Co. | $5 million | Primary |
| Zurich American Ins. Co. | $5 million | First Excess |
| Axis Ins. Co. | $5 million | Second Excess |
| Allianz/Markel | $5 million | Third Excess |

Pursuant to Sections 1.3 and 1.4 of the Excess Run-Off Policy, Underwriters shall have no liability
under the Excess Run-Off Policy unless and until all of the Run-Off Underlying Limits have been
exhausted by payment of losses under the Run-Off Underlying Insurance.

B.    Coverage Discussion

Except as otherwise provided therein, coverage under the Underwriters Excess Policies is
subject to the same terms, definitions, conditions, exclusions and limitations as are contained in
the primary policy (the "Followed Policy") issued to AmTrust by Indian Harbor Insurance
Company ("Indian Harbor"). Accordingly, any and all valid coverage issues and defenses that
have been or may in the future be asserted by the Excess Underlying Insurers and/or the Run-Off
Underlying Insurers in connection with the Consolidated Stockholder Litigation are equally
applicable under the respective Underwriters Excess Policies. Please provide us with all coverage
correspondence issued by or on behalf of the Excess Underlying Insurers and the Run-Off
Underlying Insurers with respect to the Consolidated Stockholder Litigation and any additional
correspondence from the Insureds to the Excess Underlying Insurers or the Run-Off Underlying
Insurers regarding coverage for the same.[6]

Notwithstanding the foregoing, Underwriters believe it prudent to identify for the Insureds
the following coverage issues and defenses that appear to be applicable to the Consolidated
Stockholder Litigation, based on the limited information currently known to Underwriters:

First, the Underwriters Excess Policies only provide coverage for Claims against an Insured
for a Wrongful Act, which must be committed by an Insured in their capacity as such. To that end,
Wrongful Act is defined in Section II.(U). of the Followed Policy to mean, in relevant part, an
actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of

---

[6] Underwriters have previously requested copies of all correspondence by and between the Insureds and any other
insurers but, to date, has only been provided with certain correspondence between Indian Harbor and the Insureds.

**BAILEY | CAVALIERI**

EXHIBIT 7

Peter M. Gillon
September 24, 2019
Page 4

duty by an Insured Person while acting in his or her capacity as such or due to his or her status as such.  In the Amended Verified Consolidated Class Action Complaint, the stockholders assert a cause of action against Barry Zyskind, George Karfunkel, and Leah Karfunkel in their capacities as controlling shareholders of the Company, rather than in their capacities as directors or officers of the Company.  No coverage is available under the Underwriters Excess Policies for any defense expenses or other amounts allocable or attributable to these Insureds in connection with said cause of action, or to them or any other Insureds for wrongdoing committed in any uninsured capacity.[7]

Second, as set forth above, the Underwriters' Excess Policies are claims-made policies which only afford coverage for Claims first made during the respective policy periods under those policies.  Section VI.(B). of the Followed Policy states that all Claims, Investigation Demands, Interviews or requests to toll or waive a statute of limitations, arising from the same Interrelated Wrongful Acts shall be deemed to constitute a single Claim, Investigation Demand or Interview and shall be deemed to have been made at the earliest of the time at which the earliest such Claim, Investigation Demand, or Interview is made or deemed to have been made pursuant to Section VI.(A). of the Followed Policy.  Interrelated Wrongful Act is defined in Section II.(K). of the Followed Policy to mean any Wrongful Acts, based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related facts, series of related facts, circumstances, situations, transaction or events.

Based on available information, it appears that the Consolidated Stockholder Litigation is based upon, arises out of, results from, and involves alleged breaches of fiduciary duties related to the acquisition of Tower Insurance Group and the underreporting of revenues, income and other financial metrics resulting in certain financial restatements, which were the subject of certain prior derivative lawsuits (the "Derivative Actions") filed by the class representatives in the Consolidated Stockholder Litigation.  Indeed, the stockholders' principle challenge to the process by which the go-private transaction was effectuated is due to the Special Committee Members' alleged involvement in that prior wrongdoing and their statuses as defendants in the Derivative Actions.  Moreover, a major component of the stockholders' current claims is that the Insureds failed to fairly value the Derivative Actions in the go-private transaction.  Finally, the stockholders allege that the Insureds consummated the go-private transaction in order to avoid liability for the Derivative Actions (i.e. the Consolidated Stockholder Litigation is, at least in part, a *Primedia*

---

[7] Section V.(D). of the Followed Policy provides that if both Loss covered by this Policy and loss not covered by this Policy are incurred, either because a Claim, Interview or Investigation Demand made against the Insured contains both covered and uncovered matters, or because a Claim, Interview or Investigation Demand is made against both the Insured and others (including the Company for Claims other than Securities Claims) not insured under this Policy, the Insured and the Insurer will use their best efforts to determine a fair and appropriate allocation of Loss between that portion of Loss that is covered under this Policy and that portion of loss that is not covered under this Policy. Additionally, the Insured and the Insurer agree that in determining a fair and appropriate allocation of Loss, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the Claim, Interview or Investigation Demand by, the Insured and others. Underwriters reserve their rights with respect to allocation of any defense expenses or settlement or judgment amounts pursuant to this allocation provision.

**BAILEY | CAVALIERI**

EXHIBIT 7

Peter M. Gillon
September 24, 2019
Page 5

claim which, by its nature, necessarily arises out of, results from, and involves the wrongdoing alleged in the underlying action the transaction was allegedly designed to eliminate).

Thus, both the Derivative Actions and the Consolidated Stockholder Litigation appear to be based on, arise out of, result from, and involve the same or at least related facts, circumstances, situations, transactions, and events. As a result, the Consolidated Stockholder Litigation and the Derivative Actions constitutes a single Claim first made prior to the inception of the Underwriters Excess Policies. The Underwriters Excess Policies would not afford coverage for any Claim deemed to have been first made prior to the inception of the Underwriters Excess Policies.[8]

Third, Endorsement No. 5 to the Followed Policy provides that no coverage will be available for any Claim, Interview or Investigation Demand based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any act, error, omission, misstatement, misleading statement, neglect, breach of duty or Wrongful Act committed or allegedly committed prior to October 21, 2017.

Likewise, the Excess Policy includes a Retroactive Date Inception Endorsement, which provides that the Excess Policy excludes any Loss or Claim based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

1.  any Wrongful Act actually or allegedly committed or any conduct actually or allegedly undertaken prior to 12.01am Local Time on 21st October 2017,

2.  any other Wrongful Act occurring on or subsequent to the date stated in 1. above which, together with a Wrongful Act occurring prior to such date, would constitute Interrelated Wrongful Acts, or

3.  any other conduct occurring on or subsequent to the date stated in 1. above, together with conduct occurring prior to such date, have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.

Under the heading "Substantive Allegations" in the Amended Verified Consolidated Class Action Complaint, the stockholders devote more than 40-pages to a detailed discussion of the wrongdoing and other conduct previously alleged in the Derivative Actions, all of which occurred prior to October 21, 2017. Further, the stockholders allege that this conduct was intended to lower the price of the Company below market value in an effort to help the Insureds profit from the eventual go-private transaction. To the extent any Loss or Claim is based upon, arises out of,

---

[8] Underwriters understand that, by its September 3, 2019 letter to the Insureds, Indian Harbor reversed its initial position on policy placement and agreed to treat the Consolidated Stockholder Litigation as a Claim first made during the Policy Period or the Run-Off Period. Underwriters disagree with Indian Harbor's position in this regard and reserve their rights with respect to the appropriate policy placement for this matter and the allocation of any loss between the different insurance towers that may provide coverage for this matter.

**BAILEY | CAVALIERI**

EXHIBIT 7

Peter M. Gillon
September 24, 2019
Page 6

results from, or involves any act, error, omission, misstatement, misleading statement, neglect, breach of duty or Wrongful Act committed or allegedly committed prior to October 21, 2017, no coverage would be available for such Loss or Claim under the Underwriters Excess Policies.

Fourth, Endorsement No. 6 to the Followed Policy provides that no coverage shall be available for any Loss in connection with: (i) certain Claim(s), Interview(s), Investigation Demand(s), notices, events, investigations or actions set forth in that endorsement (hereinafter "Events"); (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) any Event; or (b) any Claim, Interview or Investigation Demand arising from any Event; or (iii) any Wrongful Act, underlying facts, circumstances, acts or omissions in any way relating to any Event. Endorsement No. 6 further provides that no coverage shall be available under the Followed Policy for any Loss in connection with: (A) any restatement, retraction, amendment or revision in part or in whole: (i) any document or statement filed or submitted or required to be filed or submitted with the Securities Exchange Commission or any other similar federal, state or local agency (including but not limited to any 10Ks, 10Qs or annual reports); or (ii) any written or oral statement made regarding the assets, revenues, sales or financial conditions of the Company, based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Event or the resolution of said Event; and (B) any Claim, Interview or Investigation Demand based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an Interrelated Wrongful Act, regardless of whether or not such Claim, Interview or Investigation Demand involved the same or different Insureds, the same or different legal causes of action or the same or different claimants or is brought in the same or different venue or resolved in the same or different forum.

Among the Events listed in Endorsement No. 6 are the Derivative Actions filed by two of the class representatives in the Consolidated Stockholder Litigation (as well as other securities lawsuits related to the same alleged wrongdoing), which for the reasons discussed above appear to involve the same or at least related facts, circumstances, acts and omissions underlying and at issue in the Consolidated Stockholder Litigation. Accordingly, Underwriters expressly reserves their rights to limit or deny coverage for the Consolidated Stockholder Litigation pursuant to the exclusions in Endorsement No. 6 to the Followed Policy.

Fifth, Section III.(B).(1). of the Followed Policy provides that no coverage shall be available for any Claim, Interview, or Investigative Demand made against an Insured based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration against an Insured which was brought prior to the Pending and Prior Litigation Date (*i.e.*, October 21, 2017). As set forth above, the Consolidated Stockholder Litigation appears to be based upon, arise out of, result from, and involve facts, circumstances, situations, transactions, events, and Wrongful Acts underlying or alleged in the Derivative Actions brought against one or more of the Insureds prior to October 21, 2017. Underwriters expressly reserves their rights to deny or limit coverage under the Underwriters Excess Policies for the Consolidated Stockholder Litigation on this basis.

**BAILEY | CAVALIERI**

EXHIBIT 7

Peter M. Gillon
September 24, 2019
Page 7

Sixth, Section III.(B).(2). of the Followed Policy provides that no coverage shall be available for any Claim, Interview, or Investigative Demand made against an Insured based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act which, before the Inception Date of this Policy (*i.e.*, October 21, 2017), was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy.[9] Again, the Consolidated Stockholder Litigation appears to be based upon, arising out of, resulting from, and involving facts, circumstances, situations, transactions, events, and Wrongful Acts underlying or alleged in prior Claims first made against the Insureds prior to October 21, 2017, for which Underwriters understands the Insureds have sought coverage (and continue to seek coverage) under other insurance policies.  Underwriters reserves their rights to deny or limit coverage under the Underwriters Excess Policies for the Consolidated Stockholder Litigation on this basis as well.

Seventh, Endorsement No. 16 to the Followed Policy provides that no coverage will be available for any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act committed or allegedly committed on or after November 29, 2018 or with respect to any Interview or Investigation demand in connection with any act, fact, circumstance, transaction, or event taking place on or after November 29, 2018. The Amended Verified Consolidated Class Action Complaint filed in the Consolidated Stockholder Litigation includes a section titled "Troubling Post-Merger Developments" that details alleged wrongdoing after the Merger closed on November 29, 2018 (including the delisting of certain classes of preferred stock in 2019, which allegedly resulted in a 40% decrease in the trading price of those shares). To the extent the Consolidated Stockholder Litigation involves any Wrongful Act(s) committed or allegedly committed on or after November 29, 2018, no coverage would be available under the Underwriters Excess Policies.

Eighth, Section II.(O). of the Followed Policy defines Loss not to include, among other things: (1) any amount which is uninsurable under the laws pursuant to which the Followed Policy is construed; and (2) any amount which represents or is substantially equivalent to an increase in the consideration paid, or proposed to be paid, by the Company in connection with its purchase of any securities or assets of any person, group of persons, or entity. Underwriters would not be liable for any amounts which constitute restitution and/or disgorgement of ill-gotten gains or any other sums that do not constitute covered or insurable Loss under the Underwriters Excess Policies or applicable law.

Ninth, Section III.(B).(3). of the Followed Policy provides that no coverage shall be available for any Claim, Interview, or Investigative Demand made against an Insured brought

---

[9] Further, solely with respect to Claims, Interviews or Investigation Demands first made on or after November 29, 2018, Endorsement No. 15 to the Followed Policy provides that no coverage will be available for Claims, Interviews or Investigation Demands based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act which, before November 29, 2018, was the subject of any notice given under the Followed Policy or any other Management Liability policy, Directors and Officers liability policy or similar policy.  Underwriters reserves their rights with respect to this exclusion.

**BAILEY | CAVALIERI**

EXHIBIT 7

Peter M. Gillon
September 24, 2019
Page 8

about or contribute to in fact by any: (a) deliberately fraudulent or deliberately criminal act or omission or any willful violation of any statute, rule or law by an Insured; or (b) profit or remuneration gained by an Insured to which such Insured is not legally entitled, as determined by a final, non-appealable adjudication in the underlying action, subject to certain exceptions that do not apply here. Underwriters expressly reserves their rights to deny or limit coverage under the Underwriters Excess Policies for the Consolidated Stockholder Litigation on this basis as well.

C.   Request for Information

In addition to Underwriters' request for copies of all correspondence exchanged by and between the Insureds (or their representatives) and any of the Excess and/or Run-Off Underlying Insurers (or their representatives), please keep Underwriters closely informed of all material developments with respect to the Consolidated Stockholder Litigation and provide us with the following information and materials when available:

1.   Copies of any additional complaints, material pleadings, motions, briefs or court orders or rulings filed or entered in connection with the Consolidated Stockholder Litigation;

2.   Copies of any written analysis prepared by defense counsel in connection with the Consolidated Stockholder Litigation, including but not limited to any litigation reports, case evaluations, and liability and damages analyses;

3.   Copies of any damages analyses, studies or reports, including any draft reports, prepared for or on behalf of the Insureds in connection with the Consolidated Stockholder Litigation;

4.   Copies of any correspondence and/or agreements between the Insureds (or their representatives) and Indian Harbor (or its representatives) regarding the allocation of Defense Expenses incurred by the Insureds in connection with the Consolidated Stockholder Litigation between covered and uncovered Loss;

5.   Prior notice of any meeting with any Excess and/or Run-Off Underlying Insurer relating to the Consolidated Stockholder Litigation;

6.   Prior notice of any settlement negotiations, mediations, or settlement offers in connection with the Consolidated Stockholder Litigation; and

7.   Any other information or materials that the Insureds or defense counsel believe would be helpful to Underwriters' on-going evaluation of this matter.

**BAILEY | CAVALIERI**

EXHIBIT 7

Peter M. Gillon
September 24, 2019
Page 9

D.     <u>Reservation of Rights</u>

Underwriters reserves all of their rights and defenses under the Underwriters Excess Policies, the Followed Policy, the Excess Underlying Policies, the Run-Off Underlying Policies, and available at law with respect to this matter, including but not limited to the right to raise any terms, conditions or defenses under such policies as additional facts come to our attention. Nothing herein shall be construed as a waiver of any rights or defenses that Underwriters now has or hereafter may have under the Underwriters Excess Policies, the Followed Policy, the Excess Underlying Policies, the Run-Off Underlying Policies, or at law. Underwriters recognize that the Insureds are similarly reserving their rights.

* * *

Please contact us if you have any questions regarding the matters discussed herein. Otherwise, we look forward to receipt of the foregoing information and materials, and look forward to working with you on this matter.

Sincerely,

BAILEY CAVALIERI LLC

Keith A. Little

cc:    R. Damian Brew, Marsh USA, Inc. (Richard.D.Brew@marsh.com)
       Chris Moore, Hiscox (chris.moore@hiscox.com)
       Mark Glumac, Bailey Cavalieri (mglumac@baileycav.com)

#1691348v2

**BAILEY | CAVALIERI**

EXHIBIT 7